MERRITT, Circuit Judge,
dissenting.
In reaching its judgment against the union, the court expands the meaning of “discipline” beyond any dictionary definition and engages in linguistic wordplay over the word without even referring to or trying to understand the purpose of the statutory language at issue.
1. Denying RNs the Right to Union Membership Defies Congressional Intent — Under the labor laws, the definition of “discipline” is directly linked to the question of whether a person is a “supervisor” and hence a part of management. The whole purpose of defining “discipline” is to establish whether an employee is a “supervisor” and therefore excluded from union membership. The purpose is simply to insure that supervisors will be loyal to their employers and not be tempted to serve the union’s conflicting interests. The Supreme Court has explained the purpose of this labor-law distinction between regular and supervisory employees:
There were differences in the specific [proposed] provisions addressed to supervisory employees, but no difference in objective. Employers were not to be obliged to recognize and bargain with unions including or composed of supervisors, because supervisors were management obliged to be loyal to their employer’s interests, and their identity with the interests of rank-and-file employees might impair that loyalty and threaten realization of the basic ends of federal labor legislation.
Beasley v. Food Fair of N.C., Inc., 416 U.S. 653, 659-660, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974) (a unanimous decision quoting at length the House and Senate Reports concerning the union-membership exemption for supervisory employees who *413 have the authority to “hire,” “fire,” and “discipline” other employees) (footnotes omitted).
When disciplinary action against a nurse or hospital employee comes only after the director of nursing or the assistant director conducts an investigation and exercises independent judgment or authority— as is true in this case — the RNs’ write-ups are simply informational. The RNs do not exercise the required independent judgment about discipline. They may exercise discretion or choice about whether to make a report, but they exercise no independent judgment or any authority about disciplining another employee. Obviously, if every employee who is allowed or invited by management to make a report and pass on information to the employer about fellow employees is denied the right to union membership, there would be very few employees eligible for union membership. Under the majority’s theory, an employer could simply invite all of its employees to make reports on other employees. Any such employee would play a role in the “disciplinary process” and hence become a “supervisor.” The employee would be excluded from membership in a union and denied the right to collective bargaining. This is the broad standard the majority has adopted, and it is in direct conflict with the purpose of the Wagner and the Taft-Hartley Acts. It is a standard designed simply to foreclose collective bargaining, avoid unions, and go back to the unstable labor-management relations that existed prior to the New Deal.
2. Finding the RNs to Be Supervisors Is Inconsistent with Precedent. — See, for example, Frenchtown Acquisition Co. v. NLRB, 683 F.3d 298, 308 (6th Cir.2012), a case similar to this one holding that the fact that a report could result in disciplinary action is irrelevant and not enough to make the filer of the complaint a supervisor.[1] See also NLRB v. Meenan Oil Co., 139 F.3d 311, 322 (2d Cir.1998) (holding that a dispatcher who notifies a supervisor to complain about an employee’s conduct is merely acting as a conduit for information and exercises no disciplinary judgment in passing along the complaint). The majority’s broad construction of the word “discipline” and “supervisory status” will defeat the entire process of union recognition in the health care field under the Wagner and Taft-Hartley Acts. See Kristin Hay O’Neal, Comment and Note, “NLRB v. Health Care & Retirement Corporation of America: Possible Implications for Supervisory Status Analysis of Professionals under the National Labor Relations Act,” 47 BayloR L.Rev. 841 (1995).
The employer relies heavily on an unpublished case without precedential value, *414 Extendicare Health Servs., Inc. v. NLRB, 182 Fed.Appx. 412, 416-17 (6th Cir.2006), but in that case a write-up initiated formal disciplinary proceedings, which led directly and automatically to an investigation and appropriate sanction. Here, there is no such automatic trigger. The RNs here do not have access to employee files so they have no idea if they are the first to complain or the last and have no way of knowing whether their particular complaint led to any discipline and, if so, what kind. App’x 125-27. The employee forms contain a section to indicate the “step” in a process, but the nurses leave this section blank and, in fact, must do so because there is no way of knowing what stage the employee is in. App’x 92. The Human Resources Management Policies and Procedures Manual explicitly states that appropriate discipline will be determined “at the Company’s discretion on the basis of the particular facts or circumstances.” App’x 265. In short, there was evidence to support the finding that the nurses have no authority over disciplinary action, they are not present when such action is imposed, and they are simply left with the ministerial task of filling out the complaint form. That hardly qualifies them as a “supervisor” who has become a member of management and lost her eligibility for union membership.
3. The Majority Opinion Is Inconsistent with Chevron Deference. — In Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme- Court held that where Congress fails to resolve ambiguity in the meaning of words — words like “discipline” in this case — the courts must defer to an agency’s interpretation if it “is based on a permissible construction of the statute.” Id. at 843, 104 S.Ct. 2778. The Supreme Court has applied Chevron deference in several NLRB cases. For example, in Holly Farms Corp. v. NLRB, 517 U.S. 392, 398-99, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996), the Court said:
When the legislative prescription is not free from ambiguity, the administrator must choose between conflicting reasonable interpretations. Courts, in turn, must respect the judgment of the agency empowered to apply the law “to varying fact patterns,” even if the issue “with nearly equal reason [might] be resolved one way rather than another.”
The NLRB has a longstanding interpretation of the term “discipline” that we should pay deference to. To be considered “discipline” under the statute, a warning or write-up must “not only initiate, or be considered in determining future disciplinary action, but also it must be the basis of later personnel action without independent investigation or review by other supervisors.” Passavant Health Ctr., 284 NLRB 887, 890 (1987). Mere complaints that “do not alone affect job status or tenure do not constitute supervisory authority” and amount to “nothing more than a reporting function.” Id. at 889. The employer in this case does not challenge the reasonableness of this definition of “discipline.” Neither does the majority. They just assert that the forms meet the test. Manifestly, the forms do not convert the RNs into supervisors. The employee memorandums lead to no consequences until higher management steps in, independently investigates the situation, and makes a management decision.
4. No Action by Management Taken Arising from a RN Write-Up. — Counsel for the NLRB in its brief states as a fact: “The Center does not cite a single instance in which a write-up written by a charge nurse resulted in an investigation or disciplinary proceeding.” NLRB Br. at 12. Apparently, neither can the majority find any instance in the entire history of the *415 company where an RN’s write-up against a fellow employee caused any punishment at all by a supervisor or an executive — not even a frown, a warning, a threat to suspend or reduce pay, or any other real disciplinary action. It speaks volumes about the meaning of the ambiguous word “discipline” in this case that the employer and my colleagues can find no instance in which an RN’s complaint has ever led directly to anything resembling an order, command, chastisement, or correction designed to alter a nurse’s behavior. The company has drafted a nominal procedure that has never led to anything but an excuse for allowing the company to avoid recognizing and bargaining collectively with the union that its employees voted for as their representative. That anti-union purpose seems to be the only real purpose of the form; and, thanks to the court, the company has gotten away with its anti-union charade despite the purpose of the labor statute, the NLRB’s factual findings, and the deference that this court is supposed to give the administrative agency. The testimony of RN Vicki Jones reinforces the administrative agency’s conclusion that the forms are just a way to defeat the union:
Hearing Officer Adkins: Is your role then limited to documenting the incident or do you do more?
Jones: That’s it....
Hearing Officer: What involvement if any does the [Director of Nursing] have in these forms with you? Do you all sit down together, go over them together? Jones: No, ma’am. I call her on the phone. I show her where the situation is. I fill out the form and I slip it under her door. And I don’t hear anything back, no feedback on it.
App’x 125,127.
Should this type of arrangement turn the RN into a “supervisor” or member of management that makes her ineligible for union membership, collective bargaining, or representation?

. The Court in Frenchtown explained as follows:
Deciding whether an individual is a supervisor is a "highly fact intensive inquiry." Kentucky River Community Care, Inc. v. NLRB, 193 F.3d 444, 453 (6th Cir.2000), ajfd, Kentucky River, 532 U.S. 706, 121 S.Ct. 1861. In conducting this inquiry, the Board and "reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach.” Holly Farms Corp. v. NLRB, 517 U.S. 392, 399, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996) (deferring to the Board’s decision that certain workers were not "agricultural laborer[s]” and were therefore eligible to unionize under the Act). This court has endorsed the same principle in the context of determining whether individuals are supervisors. “It is important for the Board not to construe supervisory status too broadly, for a worker who is deemed to be a supervisor loses his organizational rights.” Williamson Piggly Wiggly v. NLRB, 827 F.2d 1098, 1100 (6th Cir.1987) (brackets and internal quotation marks omitted).
683 F.3d at 305.