**CAREMORE, INC., d/b/a Altercare of Hartville, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

**Nos. 96–6114, 96–6228.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 18, 1997.

Decided Nov. 14, 1997.

Gary W. Dubin (argued and briefed), Dubin, Joseph & Shagrin, Cleveland, OH, for Petitioner/Cross–Respondent.

David B. Schwartz (argued and briefed), Margaret Gaines Neigus (briefed), National Labor Relations Board, Office of the General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross–Petitioner.

Before: NELSON, BOGGS, and COLE, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

In this case, we are called upon for the fourth time in a reported decision to revisit the question we initially addressed a decade ago in *NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076 (6th Cir. 1987): under what circumstances do nurses qualify as "supervisors" within the meaning of Section 2(11) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(11)? As in our four prior decisions, we must vacate the order of the National Labor Relations Board ("NLRB") because we conclude that the NLRB erroneously found the licensed practical nurses ("LPNs") employed

by Caremore not to be supervisors for purposes of the NLRA.

## I

At the time the NLRB began the proceedings on which this appeal is based, Caremore operated a 66–bed extended-care nursing home in Hartville, Ohio.[1] The nursing home was under the overall supervision of an Administrator. Caremore's nursing department was headed by a registered nurse who served as Director of Nursing ("DON") and reported to the Administrator. The DON was assisted by an Assistant Director of Nursing ("ADON"), who was an LPN during the relevant period.[2] Residents of Caremore's nursing home were cared for both by LPNs and by nurses' aides. Caremore operated on a three-shift schedule. On the first shift, the nursing home was staffed by the Administrator, the DON, the ADON, two LPNs, and seven aides. On the second shift, the nursing home was staffed by two LPNs and four or five aides. The third shift staff consisted of two LPNs and four aides. Neither the Administrator, the DON, nor the ADON was present on-site during the second or third shift, although either the Administrator or the DON generally carried a pager and was designated as "on call" during these shifts.

The required qualifications and job benefits for LPNs at Caremore were somewhat more extensive than those for aides. LPNs and aides were both required to be certified by the State of Ohio. LPNs, however, were required to have completed a one-year training program, while aides were only required to have completed a 75–hour program. Although LPNs and aides were both considered hourly employees, LPNs earned $10.75 per hour on average while aides averaged $5.50 per hour.

Caremore's LPNs spent the majority of their time providing direct patient care. However, LPNs also were called upon to assign or provide direction to aides in certain circumstances. For example, LPNs were responsible for assigning aides to particular patients in the event of a staff shortage. LPNs also were responsible for calling in off-duty aides, or asking on-duty aides to work overtime, in the event a scheduled aide failed to report for a shift (although the LPNs did not have the power to compel off-duty aides to report or to require on-duty aides to work overtime). The record reveals that the NLRB regional director recognized that LPNs at Caremore provided direction to aides, although in his view this responsibility did not confer supervisory status because "any direction from LPNs typically involves aspects of patient care."

Caremore's LPNs also were involved in the evaluation and discipline of aides. LPNs filled out forms with numerical performance ratings of aides. Aides were asked to sign these evaluation forms, which then were submitted to the DON and became part of the aides' employee files. In addition, LPNs filed disciplinary notices relating to aides. In some cases, LPNs even recommended the immediate dismissal of aides. While the LPNs' disciplinary recommendations were not operative of their own force, the Administrator gave them weight in determining whether to discipline an aide.[3]

## II

On July 8, 1992, after an evidentiary hearing, the NLRB regional director concluded that Caremore's LPNs (other than the ADON) were not supervisors within the meaning of the NLRA. He therefore directed that an election be held to determine whether the Health Care and Social Service Union ("Union"), an affiliate of the Service Employees International Union, AFL–CIO, should be the exclusive collective bargaining representative for a unit of Caremore personnel including the LPNs. In reaching this conclu-

---

1. Because the size and other characteristics of the nursing home have changed somewhat during the pendency of this case, we describe Caremore's operations in the past tense.

2. The parties have stipulated that the ADON is a "supervisor" within the meaning of the NLRA.

3. The record testimony suggests that, in theory, aides had access to the same disciplinary forms used by the LPNs to "write up" aides. The Administrator testified, however, that he had never received a disciplinary notice from an aide relating to an LPN's conduct.

sion, the regional director relied, *inter alia,* on the fact that the NLRB "has consistently refused to confer supervisory status on health care employees whose instructions to other employees are merely in furtherance of patient care."[4] On April 2, 1993, following an election held on August 14, 1992, and the resolution of certain objections raised by Caremore, the NLRB certified the Union as the exclusive bargaining representative of Caremore employees in a designated bargaining unit that included all Caremore LPNs other than the ADON. Notwithstanding the NLRB's certification, Caremore refused to bargain with the Union. In response, on May 7, 1994, the General Counsel of the NLRB filed a complaint alleging that Caremore had committed an unfair labor practice in violation of the NLRA.

Caremore denied the allegations contained in the General Counsel's complaint and raised as an affirmative defense the argument that the designated bargaining unit contained supervisory personnel with whom Caremore could not be required to bargain— to wit, the LPNs. After discovery, the General Counsel moved the NLRB for summary judgment. In his brief supporting entry of summary judgment, the General Counsel conceded that Caremore's LPNs are responsible for providing direction to aides; however, he noted that "any direction from LPNs typically involves aspects of patient care." The General Counsel further recognized the LPNs' responsibility for imposing discipline on aides; again, however, he asserted that this responsibility was carried out "only under circumstances where patient care is impacted." Caremore opposed the General Counsel's motion, quoting, *inter alia,* our repeated admonition that "where nurses otherwise meet the statutory definition of supervisors, they are not disqualified because the activity they are supervising is patient care." *Beverly California Corp. v. NLRB,* 970 F.2d 1548, 1549 (6th Cir.1992).

The NLRB granted the General Counsel's motion for summary judgment by a 2–1 vote and, in an order dated July 26, 1996, ordered Caremore to bargain with the Union. In doing so, the NLRB declined to rely on the regional director's rationale that Caremore's LPNs exercised supervisory authority "merely in furtherance of patient care," inasmuch as an intervening Supreme Court decision had affirmed one of our decisions rejecting exactly this rationale. *See NLRB v. Health Care & Retirement Corp.,* 511 U.S. 571, 577, 114 S.Ct. 1778, 1782, 128 L.Ed.2d 586 (1994). Instead, the NLRB relied in large part on the proposition that the supervisory authority it recognized Caremore's LPNs to possess was exercised only in "sporadic or isolated instances that are insufficient to confer supervisory status." In the wake of the NLRB's decision, Caremore and the NLRB cross-petitioned this court for review and enforcement, respectively, of the NLRB's order pursuant to 29 U.S.C. §§ 160(e) and (f).

### III

The NLRA protects employees' right to form and join labor unions and to bargain collectively through a labor union acting as their bargaining representative. *See* 29 U.S.C. § 157. The right to organize and bargain collectively does not extend to "supervisors," who are excluded from the statutory definition of "employee." *See* 29 U.S.C. § 152(3). Under the NLRA, a "supervisor" not covered by the collective bargaining provisions of the NLRA is:

> Any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such actions, if in connection with the foregoing, the exercise of such authority is not of a merely routine nature,

4. While the regional director's analysis was incorrect when made, under our holding in *Beacon Light,* 825 F.2d at 1079, we note that his decision was issued several weeks before we reaffirmed and further developed our *Beacon Light* holding in *Beverly California Corp. v. NLRB,* 970 F.2d 1548, 1549 (6th Cir.1992), and before the Supreme Court endorsed *Beacon Light* and its progeny in *NLRB v. Health Care & Retirement Corp.,* 511 U.S. 571, 577, 114 S.Ct. 1778, 1782, 128 L.Ed.2d 586 (1994).

but requires the use of independent judgment.

29 U.S.C. § 152(11). As a convenient shorthand, we have distilled three elements from the statutory definition of supervisor. To be considered a supervisor, (1) an individual must exercise authority in at least one of the areas listed in the statute, (2) when exercised, that authority must be exercised in the interests of the employer, and (3) the exercise of authority must require the use of independent judgment. *See Beverly California*, 970 F.2d at 1552. In reviewing the NLRB's determination that Caremore's LPNs were not statutory supervisors, we must ascertain whether that determination is supported by substantial evidence on the record as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). The "substantial evidence" standard does not leave factual questions wholly to the NLRB; to the contrary, it requires us to take account of the evidence that undermines the NLRB's conclusions. *See Hickman Harbor Svc. v. NLRB*, 739 F.2d 214, 219 (6th Cir.1984).

At oral argument, counsel for the NLRB contested the proposition that Caremore's LPNs exercise *any* statutorily cognizable supervisory authority. Both the record evidence and the NLRB's own findings make this a difficult argument for the NLRB to sustain on appeal. The NLRB regional director found that Caremore's LPNs provided direction to aides involving "aspects of patient care." Specifically, LPNs assign aides to particular wings or even particular patients in the event of a staffing imbalance or staffing shortage. LPNs also have the responsibility to request (though they cannot require) off-duty aides to come in, or to request on-duty aides to work overtime, in the event that other aides fail to report for work as scheduled. These kinds of duties indicate that Caremore's LPNs have the authority to "assign" and "responsibly to direct" the work of aides. *See Beverly California*, 970 F.2d at 1550, 1552 (nurses who "had authority to call people in (according to seniority) to cover for absent employees [and] to transfer ... nurse's aides between wings to compensate for temporary personnel shortages" had authority "responsibly to direct" other employees within meaning of NLRA).

The record also demonstrates that Caremore's LPNs are substantially involved in the evaluation and discipline of aides. The NLRB recognized in its decision that "the LPNs have from time-to-time [sic] participated in the evaluation of aides." The NLRB also recognized that LPNs "have on occasion filled out 'Disciplinary Notice' forms." Indeed, the record contains numerous copies of disciplinary notices bearing the signatures of various LPNs, including three disciplinary notices that recommend the "immediate dismissal" of aides.

■ The NLRB appears to have discounted this evidence on two grounds. First, the LPNs apparently exercised their authority to assign, direct, evaluate, and recommend discipline only occasionally. According to the NLRB, where a supervisory function listed in the NLRA is performed only "sporadically," the person who performs the function cannot be considered a supervisor. We have repeatedly rejected this contention. *See Beverly California*, 970 F.2d at 1550 n. 3; *NLRB v. Medina County Publications, Inc.*, 735 F.2d 199, 201 (6th Cir.1984); *Federal Compress & Warehouse Co. v. NLRB*, 398 F.2d 631, 634 (6th Cir.1968). "It is the existence of [a statutorily listed] authority that counts under the statute, and not the frequency of its exercise." *Beverly California*, 970 F.2d at 1550 n. 3.

■ Second, the NLRB relies heavily on the fact that the evaluations and disciplinary notices filed by the LPNs were subject to review by the Administrator. But the NLRA does not require, for example, that an individual possess authority to fire an employee in order to be considered a supervisor; it is sufficient that the individual has the power "effectively to recommend" that an employee be fired. *See* 29 U.S.C. § 152(11). The record is replete with examples of disciplinary notices on which LPNs recommend the "immediate dismissal" of aides. Moreover, when asked "what type of weight" he gave to disciplinary reports filed by LPNs, the Administrator testified "[a] lot.... If we go to a point where the L.P.N. deems

that it's necessary that a write-up occur, then I would weigh that a lot, that there must be really a problem out there that the aid[e] is not following *the direction* of the L.P.N." (emphasis added).[5] On these facts, to accept the NLRB's finding that Caremore's LPNs did not possess any statutorily cognizable authority would be to render the statutory phrase "effectively to recommend" nugatory. This we decline to do. It is clear that, under Section 2(11), "the relevant consideration is effective recommendation or control rather than final authority." *Waldau v. Merit Sys. Protection Board,* 19 F.3d 1395, 1400 (Fed. Cir.1994). "The [NLRA] does not preclude supervisory status simply because the recommendation is subject to a superior's investigation." *ITT Lighting Fixtures v. NLRB,* 712 F.2d 40, 45 (2d Cir.1983), *cert. denied,* 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 833 (1984). Accordingly, we conclude that the LPNs did possess authority in one or more of the statutorily specified areas.

We therefore must decide whether the LPNs exercised their authority "in the interest" of Caremore, or for some other purpose. The NLRB wisely decided not to rely on the regional director's rationale that "employees whose instructions to other employees are merely in furtherance of patient care" do not exercise authority in the interest of their employer. The Supreme Court rejected this rationale in *Health Care & Retirement Corp.,* 511 U.S. at 577, 114 S.Ct. at 1782. It is worth noting that the regional director's rationale, on which he relied in 1992, has been rejected consistently in this circuit since 1987. *See Beacon Light,* 825 F.2d at 1079; *Beverly California,* 970 F.2d at 1553; *Health Care & Retirement Corp. v. NLRB,* 987 F.2d 1256, 1260 (6th Cir.1993), *aff'd,* 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994); *Manor West, Inc. v. NLRB,* 60 F.3d 1195, 1198 (6th Cir.1995). In light of these cases, we conclude (and the NLRB does not appear to dispute on appeal) that the LPNs' authority was exercised in the interest of Caremore, their employer.

It remains only to determine whether the authority exercised by Caremore's LPNs required the use of independent judgment. The NLRB argues that whatever authority the LPNs had, it required "merely routine" decision making rather than independent judgment. Once again, the NLRB's assessment is not borne out by the record. It is clear—and the NLRB conceded as much in its decision—that Caremore's LPNs possess at least some evaluative and disciplinary authority with respect to aides. The evaluation forms contained in the record indicate that the LPNs were responsible for rating aides' performance on a 20–point scale for each of seven performance dimensions, for assigning an overall performance rating of "outstanding," "above ave.," "average," or "below ave.," and for answering "yes" or "no" to the question "recommend continued employment." The disciplinary forms contained in the record require LPNs to decide whether merely to recommend a "violation notice," or to recommend "immediate dismissal." These forms also ask the LPNs to choose from more than 35 categories of violation descriptions, and to provide a written narrative regarding the incident. These kinds of sensitive and nuanced judgments are hardly routine, and we have held in our prior cases that the authority to evaluate other employees or to recommend that they be disciplined satisfies the requirements of Section 2(11) of the NLRA. *See, e.g., Manor West,* 60 F.3d at 1197–98. We reaffirm those holdings today.

### IV

■ As we have previously noted, "the question of supervisory status [under the NLRA] predominantly involves a factually intense inquiry into the circumstances of each individual case...." *Beverly Enters. v. NLRB,* 661 F.2d 1095, 1102 n. 3 (6th Cir. 1981). Nonetheless, we wish to emphasize that this is not a close case. In addition to the conceded fact that Caremore's LPNs occasionally assign, direct, evaluate, and recommend the discipline and dismissal of aides,

---

**5.** The record reveals at least one example in which an aide was actually terminated on the recommendation of an LPN.

many collateral facts in the record make clear the LPNs' supervisory status. For example, neither the Administrator, the DON, nor the ADON is on duty during the second or third shift; thus, if the LPNs are not supervisors during those shifts, then "nursing personnel frequently were providing patient care with no on-site supervision. This is not a reasonable conclusion for a well-run nursing home...." *Beacon Light,* 825 F.2d at 1080. In addition, Caremore issues keys to nursing-home facilities to LPNs but not to aides. These and similar facts in the record are not necessary to our decision in this case, but they do remove it from the category of "close calls" that inevitably arise from time to time in any factually intensive area where we review an agency's decision under the "substantial evidence" standard.

The distinction between "close cases" and other cases suggests that our recognition of the fact-intensive nature of supervisory-status cases is not an open invitation for the NLRB to use razor-thin factual distinctions as a basis for requiring employers in the health-care field to bear the expense of proving, in each individual case, that their nurses are supervisors within the meaning of the NLRA. We are well aware (as, apparently, is the Supreme Court) that "[i]n cases involving nurses, the [NLRB] ... has interpreted" Section 2(11) of the NLRA "in a unique manner." *Health Care & Retirement Corp.,* 511 U.S. at 574, 114 S.Ct. at 1780. The NLRB's position generally has been that supervisory status is almost never to be accorded nurses whose supervisory authority is exercised over less-skilled professionals in the interest of patient care. *See generally ibid.* The NLRB has adhered to this line despite our repeated admonitions to the contrary. We therefore have had to admonish the NLRB for choosing "not to follow the law of this Circuit," *Manor West,* 60 F.3d at 1198, and repeatedly to "remind the [NLRB] that it is the courts, and not the [NLRB], who bear the final responsibility for interpreting the law." *Health Care & Retirement Corp.,* 987 F.2d at 1260. Because the NLRB continues to misapprehend both the law and its own place in the legal system, today we state for the fifth time that individuals who possess authority in any area listed in Section 2(11) of the NLRA (*including* the authority effectively to recommend any of the specifically listed actions), who exercise that authority in the interest of their employer (*including* cases in which the employer's interest is furthered by the provision of patient care), and who use independent judgment in the exercise of that authority, are supervisors within the meaning of the NLRA.

Our judgment today should provide more than cold comfort for Caremore, which has been forced to bear attorneys' fees and other costs in order to vindicate its rights under the established law of this circuit. The Equal Access to Justice Act, 5 U.S.C. § 504, permits private parties subject to administrative adjudications to petition the adjudicating agency for recovery of costs and fees from the United States in cases where the government's position was not "substantially justified." Like other circuits, we have ordered the award of attorneys' fees in cases where the NLRB's litigating position was inconsistent with established precedent. *See M.P.C. Plating, Inc. v. NLRB,* 953 F.2d 1018, 1025 (6th Cir.1992); *Hess Mechanical Corp. v. NLRB,* 112 F.3d 146, 147 (4th Cir.1997); *Quality C.A.T.V., Inc. v. NLRB,* 969 F.2d 541, 546–47 (7th Cir.1992).

## V

For the foregoing reasons, Caremore's petition for review is GRANTED; the NLRB's cross-application for enforcement is DENIED; and the order of the NLRB is VACATED.